UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DARRIUS MONROE,

      Plaintiff,

v.              Case No. 20-cv-229-pp

CYNTHIA KOREN, ERIC NELSON,
JEAN LUTSEY, B. BLAIR,
and MARK ROBERT SCHICK,

      Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 4), GRANTING MOTION FOR EXTENSION OF TIME (DKT. NO. 8) AND SCREENING COMPLAINT UNDER 28 U.S.C. §1915A**

  Plaintiff Darrius Monroe, an inmate at Green Bay Correctional Institution who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 4, and screens his complaint, dkt. no. 1.

  This case currently is assigned to Magistrate Judge Nancy Joseph. Although the plaintiff consented to Judge Joseph hearing and deciding the case, the defendants have not yet had the opportunity to decide whether to consent because, until now, the court has not screened the complaint and decided whether it should be served on the defendants. Because all parties have not yet consented to the magistrate judge hearing the case, the clerk's office has referred the case to this district judge to screen the complaint and

1

decide whether it should be served on any of the defendants. The court dismisses two defendants and allows the plaintiff to proceed against two others and will return the case to Judge Joseph.

I.  **Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 4)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was a prisoner when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA allows the court to give a prisoner plaintiff the ability to proceed with his case without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the prisoner must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On February 21, 2020, Judge Joseph ordered the plaintiff to pay an initial partial filing fee of $12.91. Dkt. No. 6. On the day his payment was due, the plaintiff filed a motion to extend the deadline to pay the fee. Dkt No. 8. Before Judge Joseph ruled on the motion, the court received the initial partial filing fee. The court will grant the plaintiff's motion for an extension of time and his motion for leave to proceed without prepaying the filing fee. He must pay the remainder of the filing fee over time in the manner explained at the end of this order.

II.  **Screening the Complaint**

   A.  Federal Screening Standard

Under the PLRA, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a

2

governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by

3

plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B. The Plaintiff's Allegations

The plaintiff alleges that on May 30, 2018, he was playing basketball when he felt a pop in his left Achilles tendon, followed by intense pain. Dkt. No. 1 at ¶17. He says that he couldn't put weight on his left foot. Id. The plaintiff says that Health Services Unit Nurse Steve Bost (who is not a defendant) performed a "Thompson Test" and diagnosed a suspected left Achilles injury. Id. The next day, there was an institutional lock down, so Health Services Unit nurse practitioner Sue Peters (not a defendant) rescheduled his appointment. Id. at ¶18. On June 1, 2018, defendant Dr. Cynthia Koren spoke to defendant Dr. Mark Robert Schick from Prevea Orthopedic. Id. at ¶19. Schick advised Koren to place the plaintiff in a non-walking boot and give him crutches. Id. Schick took the plaintiff's name in order to see the plaintiff early in the week of June 4, 2018. Id. The plaintiff also says that Koren saw him that day. Id. at ¶20. The plaintiff says that Koren called Schick "on June 4th had to wait for a call back, for an appointment to be scheduled." Id. at ¶21.

Koren saw the plaintiff on June 6, 2018 and issued him a CAM boot (a walking boot) for his foot and Tramadol for his pain. Id. at ¶22. A follow-up appointment was scheduled for June 13, 2018. Id. Koren allegedly spoke to Schick on June 14, 2018. Id. at ¶22. The plaintiff alleges that an MRI was scheduled "to be done ideally within 1-2 weeks." Id. The plaintiff says, however,

4

that the MRI was not done until July 18, 2018, because Schick did not specify when it should be done; he says that on July 10, Koren "noted the MRI as scheduled was fine." Id. at ¶23.

The plaintiff asserts that before the July 18, 2018 MRI, he wrote health services at least five request slips complaining about intense pain and the ineffectiveness of the medication he was on, asking when the MRI was going to be done and what medical attention he was going to get to "fix his achilles." Id. at ¶24. Nurse Steaven (not a defendant) allegedly responded that an MRI was pending and that the doctor's plan of care was to continue with ibuprofen and acetaminophen for the pain. Id. Defendant health services unit manager Jean Lutsey scheduled an appointment for the plaintiff's migraines, which he says were caused by the pain he was suffering from the Achilles injury. Id. He says that Lutsey also informed him that an MRI was scheduled. Id. Defendant Nurse Blair also told the plaintiff that an MRI was scheduled and to continue with the prescribed medications and his walking boot. Id.

The plaintiff alleges that health services staff saw him on July 17, 2018, and that he told them that the Tylenol and Meloxicam helped with the headache but not with the pain in his Achilles tendon. Id. at ¶25. He asked staff to speak with Koren, who he says was "right across the hall," but they told him "that is not how the process works." Id. The staff said that if the plaintiff wanted to be scheduled to see a doctor for pain control, he would be, and that the MRI would be soon. Id.

The plaintiff says that the MRI was done on July 18, 2018 (the next day). Id. at ¶26. He asserts that he wrote health services several requests asking what the MRI showed. Id. He also asked for a renewal of his ice bag accommodation and for pain medication, noting that he'd endured pain in the Achilles for three weeks without pain medication. Id. The plaintiff says he felt positive that the MRI showed something wrong with his Achilles. Id. Blair informed him that "an off site appointment was scheduled and to continue with APAP[1] and meloxicam." Id. He said that Blair did not mention the ice bag renewal. Id.

The plaintiff appears to have a copy of his medical file. He says that on July 23, 208, an "urgent fax was received from ortho office flagged for ACP [advanced care provider] as well as verbalized receipt to ACP. -ACP acknowledged." Id. at ¶28. He indicates that the same day, the HSU staff called the "ortho office;" the notes appear to indicate that "Dr. Koren will decide follow up date and return call to GBCI." Id. ¶29. He goes on to say, "[o]n July 23rd, per RN at ortho, appointment works with Dr. and okay with GBCI as well." Id. at ¶29. The plaintiff says that on July 23, 2018, Koren told him that he would have a follow-up appointment with Schick in one to two weeks. Id. at ¶27.

On August 8, 2018, Schick recommended that the plaintiff continue to bear weight in his walking boot for two weeks, then use regular shoes with heel lifts for one month. Id. The plaintiff alleges that Schick told him that there

---

[1] "APAP" is an abbreviation for acetaminophen, an acronym created from the first initials of the major chemical elements of the drug—N-**a**cetyl-**p**ara-**a**mino**p**henol. https://www.dictionary.com/e/tech-science/apap/

6

would be no surgery because of the significant amount of scar tissue had developed as a result of Green Bay's delayed response. Id. The plaintiff says that the MRI showed a "near complete rupture of [the plaintiff's] left achilles tendon that left an 4 cm gap between retracted ends." Id. He asserts that his prescription for meloxicam was discontinued because he reiterated that it was ineffective in dealing with the pain. Id.

The plaintiff says that on August 15, 2018, he was taken out of the walking boot and given shoe wedge lifts. Id. at ¶31. He says that that same day, Koren sought a second opinion. Id. The plaintiff explains that he was in the boot for approximately 70 days. Id. at ¶32. On October 1, 2018, the plaintiff went to see defendant Dr. Eric Nelson for a second opinion. Id. ¶33. The plaintiff says that Nelson was "against surgery" because it was not his practice to operate on "inmates" with Achilles tendon ruptures. Id. The plaintiff says, "Dr. Nelson would perform the surgery if injury occurred to an 'Elite athlete.'" Id. at ¶34. The plaintiff says that Nelson recommended that he continue with rehab. Id. at ¶35.

The plaintiff explains that he had a limp at the time of the second opinion and that he still has a limp in the morning hours and when he stands too long. Id. at ¶36. He says he still has extreme pain in the tendon after activities and does not have the same use of his foot as he had before; he can't enjoy a game of basketball but must sit on the sidelines and watch. Id. He cannot do any kind of running activity. Id.

The plaintiff seeks declaratory relief and money damages. Id. at ¶¶46-48.

7

C.  <u>Analysis</u>

The plaintiff has sued Dr. Koren, Dr. Nelson, Jean Lutsey, B. Blair and Dr. Schick. Dkt. No. 1 at 1. His claims fall into two categories. One category of claims is that HSU staff—Lutsey and Blair—were deliberately indifferent to the pain he suffered as a result of the ruptured Achilles tendon. The second category has to do with the plaintiff's belief that the delay in performing the MRI allowed scar tissue to develop, preventing a surgery that the plaintiff believes would have prevented him from having a limp and the other issues he continues to suffer from. Both categories of claims implicate the Eighth Amendment's prohibition against cruel and unusual punishment, which obligates the government "to provide medical care for those whom it is punishing by incarceration." <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976).

Regarding the plaintiff's claim of deliberate indifference to his pain, "[t]he Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" <u>Arnett v. Webster</u>, 658 F.3d 742, 750 (7th Cir. 2011) (quoting <u>Rodriguez v. Plymouth Ambulance Serv.</u>, 577 F.3d 816, 828 (7th Cir. 2009)). To show that any of the defendants were deliberately indifferent to his pain, an inmate must show that the defendants knew "of a substantial risk of harm to an inmate and either act[ed] or fail[ed] to act in disregard of that risk." <u>Id.</u> at 751 (quoting <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011)). "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" <u>Id.</u> (quoting <u>Collignon v. Milwaukee Cty.</u>, 163 F.3d 982, 988 (7th Cir. 1998)).

The plaintiff received Tramadol for his pain on June 6—a week after the injury. He says that before the July 18 MRI, he wrote health services at least five request slips complaining about the pain and the fact that the pain medication wasn't working. He says one of the nurses (not a defendant) told him that the "MD's plan of care" was to continue with ibuprofen/acetaminophen for the pain. He asserts that the health services unit manager, Lutsey, scheduled an appointment for the migraines he was suffering, that he believed were the result of the pain in his tendon. He says that Blair told him to continue with the prescribed medications and his walking boot. The plaintiff says that on July 17, 2018 he told HSU staff that the Tylenol and meloxicam helped with the headache but not with the pain in his Achilles tendon, and he asked to speak with Koren, who he says was "right across the hall." He says the staff told him that was not how the process worked but that if he wanted to be scheduled to see a doctor for pain control, he would be. He does not say whether he made that request. The plaintiff says that after the MRI, he wrote health services several requests asking what the MRI showed and asking for renewal of his ice bag restriction and for pain medication, noting that he'd endured pain in the Achilles for three weeks without pain medication. He says that Blair told him to continue with the acetaminophen and meloxicam but did not mention the ice bag renewal.

The plaintiff has not stated a deliberate indifference claim against Lutsey or Blair. First, the plaintiff indicates that he was told that it was the *doctors'* plan—"the MD's plan of care"—to treat his pain with ibuprofen and/or

9

acetaminophen. "A licensed practical nurse . . . [is] able to rely on [the doctor] to determine the proper dosage . . . to treat the ongoing pain [the plaintiff] was experiencing . . . . Hers was not the responsibility to second-guess [the doctor's] judgment, especially when nothing about [the doctor's] prescriptions or course of care more generally raised any obvious risks of harm for [the plaintiff]." McCann v. Ogle Cty., Ill., 909 F.3d 881, 887 (7th Cir. 2018). See also, Pulera v. Sarzant, 966 F.3d 540, 553 (7th Cir. 2020) ("All four nurses were entitled to defer to [the doctor's] medical judgment weighing the costs and benefits of [the choice between denying medication and risking overdose].") Lutsey and Blair were entitled to rely on the doctors' decision to manage the plaintiff's pain with ibuprofen/acetaminophen.

Second, even if Lutsey and Blair had been the ones who decided how to treat the plaintiff's pain, the plaintiff *was* prescribed pain medication—Tramadol early on, ibuprofen/acetaminophen and meloxicam (which is an NSAID used to reduce pain, swelling and stiffness in joints, particularly for those who suffer from arthritis, https://www.webmd.com/drugs/2/drug-911/meloxicam-oral/details) later. The plaintiff says that these medications were not enough for the pain in his Achilles tendon (although it did work for his migraines). But "[n]either medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." Berry v. Peterman, 604 F. 3d 435, 441 (7th Cir. 2010) (citing Estelle, 429 U.S. at 106). "A medical professional acting in [her] professional capacity may be held to have displayed deliberate

indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards that the person responsible actually did not base the decision on such a judgment." Sain v. Wood, 512 F.3d 886, 895 (7th Cir. 2008).

Third, the plaintiff says that on July 17, he asked to see Koren; he implies that it should have been easy enough for HSU staff to grant this request because Koren was nearby. HSU staff responded that this wasn't the appropriate procedure. The plaintiff does not say which HSU staff members told him this; he does not mention Lutsey or Blair in this context. Even if he had, however, he also says that the HSU staff told him that if he wanted to be scheduled to see a doctor about pain management, he could be. So while staff did not allow the plaintiff to see Koren that day, they gave him an option to see a doctor about his pain.

Finally, the plaintiff says that Blair did not respond to his request to renew his ice bag accommodation. This is not enough to state a claim for deliberate indifference. Perhaps Blair did not see that request. Perhaps she forgot. Perhaps she was not the person who made the decision about such accommodations. Without more, the fact that Blair did not respond to the ice bag request is not enough to state a constitutional violation.

Regarding the plaintiff's claim that the delay in performing the MRI resulted in him being unable to have surgery because of the scar tissue that had accrued: The plaintiff asserts that based on their professional experience, "policy and procedures," Koren, Schick, Lutsey and Blair knew "that surgery on

11

a ruptured achilles had to be performed within 1-2 weeks after initial injury" and that "[t]he Cam Boot was not an approved treatment for this kind of injury." Dkt. No. 1 at ¶32. The plaintiff implies that not ensuring that he had surgery within one to two weeks of his injury was "so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." Arnett, 658 F.3d at 751 (quoting Duckworth v. Ahmad, 532 F. 3d 675, 679 (7th Cir. 2008)).

The plaintiff first saw a doctor on June 1, two days after his injury. He saw Koren that day. It appears that Koren immediately consulted with orthopedic specialist Schick, who advised the boot and crutches and made an appointment to see the plaintiff the week of June 4 (five to eleven days after the injury). Koren (who, the court assumes, is not an orthopedic doctor) followed up, calling Dr. Schick on the 4th, but had to await a call back for an appointment for the plaintiff. On June 6, Koren saw the plaintiff and provided the boot Schick had recommended and Tramadol for the pain. The plaintiff says that a follow-up to assess the tendon "was scheduled" for June 13, but he doesn't say who scheduled this follow-up or with whom he was supposed to have it. So the plaintiff did not see an orthopedic specialist in the two weeks after his injury. But that does not appear to have been the result of any indifference or failure on Koren's part. Koren took every step Schick advised, followed up on the dates that were set, and saw the plaintiff at least twice during that time.

12

Koren spoke with Schick on June 14. The plaintiff says that an MRI "was scheduled to be done ideally within 1-2 weeks." He does not say who decided an MRI was necessary or who scheduled it. He does not say who decided that ideally it needed to be done in one to two weeks, or why. The court infers that Schick would have been the one to schedule the MRI, because he was the specialist. But while the plaintiff says that "ideally" the MRI should have been performed in one to two weeks, he says that Schick did not specify a time frame in which the MRI should be done; the plaintiff believes this is why the MRI didn't take place until June 18—over six weeks after his injury occurred. The plaintiff also says that on July 10, Koren "noted the MRI as scheduled was fine." The plaintiff implies that Schick erred in failing to specify a time frame in which the MRI needed to be performed, and that Koren failed to point out a problem with the date that was scheduled for the MRI.

As best the court can tell, the plaintiff believes that on July 23, his advanced care provider—Koren—received an "urgent" fax from Schick (the "ortho's office"); HSU staff responded by telling Schick's office that Koren would decide on a follow-up date and then call the Green Bay staff. The notes seem to indicate that Koren set up an appointment that day, and that Schick's office's notes indicate that the date picked was good for Schick and the staff at Green Bay. The same day—July 23—Koren told the plaintiff that he was to have a follow-up with Schick in one to two weeks (which would have been around August 6 or so). The plaintiff says that the follow-up appointment took place on August 8, which would have been over two months from the date of injury. It

13

was at the August 8 follow-up appointment that the plaintiff learned from Schick that there would be no surgery because of the scar tissue that had accrued. The plaintiff says that the scar tissue accrued "due to 'Green Bay's delayed response." The court cannot tell whether the plaintiff believes that the delay was Green Bay's fault, or whether he is asserting that Schick told him it was Green Bay's fault.

The plaintiff has not stated a claim against Lutsey and Blair regarding the delay; Koren and/or Schick decided an MRI was necessary, decided that it should "ideally" take place in one to two weeks, reviewed the results and scheduled the follow-up appointment. As the court found regarding the plaintiff's claim about pain, Lutsey and Blair were entitled to rely on the judgment of the doctors. To the extent that the plaintiff has named Lutsey because she was the manager of the HSU, he has not stated a claim. While supervisors can be held liable for constitutional violations committed by their supervisees if the violations happened at the supervisor's direction or with her knowledge or consent, Hildebrandt v. Ill. Dept of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003), the plaintiff has not stated sufficient facts to indicate that anyone whom Lutsey supervised committed a constitutional violation.

By the plaintiff's account, both Koren and Schick were attentive to his medical needs. The crux of the plaintiff's argument is that Koren and Schick should have known that someone with a ruptured Achilles had to have surgery within one to two weeks of the injury and that Schick should have known that the boot was not an accepted treatment.

14

On the one hand, it sounds as if the plaintiff is accusing Koren and Schick of committing malpractice. The court already has noted that malpractice does not rise to the level of a constitutional violation. Berry, 604 F. 3d at 441. But the plaintiff is representing himself, which means that the court must construe his complaint "'liberally,' holding it to a 'less stringent standard than formal pleadings drafted by lawyers.'" Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (quoting Arnett, 658 F.3d at 751). So the court must consider the possibility that the plaintiff is claiming that any minimally competent doctor would have known that the boot was not the approved treatment for his injury and that it was imperative that he have surgery within one to two weeks of his injury.

Perhaps the plaintiff is making "a challenge to 'a deliberate decision by a doctor to treat a medical need in a particular manner.'" Lockett v. Benson, 937 F.3d 1016, 1023 (7th Cir. 2019) (citing Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 2996)). "In such cases, [the court] defer[s] to a medical professional's treatment decision 'unless "no minimally competent professional would have so responded under those circumstances."'" Id. (quoting Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014)). This standard reflects that "there is no single, '"proper" way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field.'" Id. (quoting Jackson v. Kotter, 541 F.3d 688, 697 (7th Cir. 2008)). "A plaintiff can show that the [medical] professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional

15

judgment, that is, that 'no minimally competent professional would have so responded under those circumstances.'" Arnett, 658 F.3d at 751 (quoting Elyea, 631 F.3d at 857).

While it is a close call, the court will allow the plaintiff to proceed against Koren and Schick on a claim that their decisions in giving the plaintiff the boot, requiring an MRI, approving the timing of the MRI and scheduling the follow-up were so inadequate given the plaintiff's injury that no minimally competent professional would have responded that way under the circumstances.

Finally, the plaintiff alleges that Dr. Nelson, who provided the second opinion, "denied" the plaintiff the "delayed" surgery because the plaintiff was an inmate and not an elite athlete. The court will not allow the plaintiff to proceed against Nelson. Nelson was not his treating physician. Nelson did not deny the plaintiff the surgery; he gave an opinion. Even if, as the plaintiff assumes, Nelson was discriminating against the plaintiff based on the plaintiff's status as an inmate, that is not a deliberate indifference claim but an equal protection claim. The plaintiff says only that "[p]olicy and procedure has allowed for past inmates to receive operations immediately after injury and delayed time structures." Dkt. No. 1 at ¶35. This bald assertion is not sufficient to state an equal protection claim.

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 4.

16

The court **GRANTS** the plaintiff's motion for an extension of time. Dkt. No. 8.

The court **ORDERS** that defendants Eric Nelson, Jean Lutsey and B. Blair are **DISMISSED**.

The court **ORDERS** the U.S. Marshals Service to serve a copy of the complaint and this order on defendants Cynthia Koren and Mark Robert Schick under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** defendants Koren and Schick to file a responsive pleading to the complaint.

The court **ORDERS** that the agency that has custody of the plaintiff shall collect from his institution trust account the **$337.09** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency shall clearly identify the payments by the case name and number.

17

If the plaintiff transfers to another county, state or federal institution, the transferring institution shall forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the officer in charge of the agency where the plaintiff is confined.

The case is no longer referred to Chief United States District Judge Pepper. The court **RETURNS** this case to United States Magistrate Judge Joseph for further proceedings.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court **ORDERS** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss

18

Case 2:20-cv-00229-NJ-PP   Filed 10/21/20   Page 18 of 19   Document 10

the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. Failure to do so could result in orders or other information not being timely delivered, which could affect the legal rights of the parties.

Dated in Milwaukee, Wisconsin, this 21st day of October, 2020.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**